**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELE D. GUTHRIE, | ) | CASE NO. 3:22-CV-01309-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL |
| SECURITY, | ) | ARMSTRONG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Michele D. Guthrie ("Ms. Guthrie") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Social Security Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated September 2, 2022). For the reasons set forth below, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

## II.      PROCEDURAL HISTORY

On July 2, 2019, Ms. Guthrie filed her application for DIB. (Tr. 169). Ms. Guthrie listed the following conditions that limited her ability to work: seizures; stroke; heart valve; depression; and anxiety. (Tr. 195).

The Social Security Administration ("SSA") denied Ms. Guthrie's application initially and upon reconsideration. (Tr. 86, 100). Ms. Guthrie requested a hearing before an

administrative law judge ("ALJ"). (Tr. 121). The ALJ held a telephonic hearing on November 10, 2020, at which Ms. Guthrie was represented by counsel. (Tr. 30). Ms. Guthrie testified, as did an impartial vocational expert. ("VE"). On February 3, 2021, the ALJ issued a written decision, finding that Ms. Guthrie was not disabled. (Tr. 10). The ALJ's decision became final on May 31, 2022, when the Appeals Council declined further review. (Tr. 1).

On July 25, 2022, Ms. Guthrie filed her Complaint, challenging the Commissioner's final decision that Ms. Guthrie was not disabled. (ECF Doc. No. 1). Ms. Guthrie asserts the following assignment of error:

(1)     The state agency psychologists opined that Ms. Guthrie was limited to superficial interaction with others. The ALJ improperly rejected that limitation by violating 20 C.F.R. § 404.1520c during the evaluation of their opinions.

(ECF No. 6, PageID # 978).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Ms. Guthrie was born in 1976 and was 38 years old on the alleged onset date. (Tr. 169). Ms. Guthrie is married and has two children. (Tr. 169-70). Ms. Guthrie received an associate's degree in respiratory therapy. (Tr. 37). Ms. Guthrie has prior work experience as a licensed respiratory therapist. (Tr. 37-38).

### B.    <u>Relevant Hearing Testimony</u>

#### 1.    *Ms. Guthrie's Testimony*

Ms. Guthrie testified that she has "a lot of different seizure activities." (Tr. 42). She testified that "it's not always the on the floor grand mal seizures but I have a lot of little ones and it causes my brain just not to – not to think like I need to think." *Id*. Ms. Guthrie also testified that she experiences miniature seizures two to three times a month, and that she was experiencing them more frequently before she began receiving treatment at the Cleveland

Clinic. (Tr. 59). Ms. Guthrie testified that her current medication is generally effective other than "mini little" seizures that she continues to experience. (Tr. 48). Ms. Guthrie further testified that the seizures affect her memory and cause her to have difficulty expressing herself. (Tr. 43-44).

Ms. Guthrie also testified that she experiences severe headaches two to three times a week, which feel like someone is drilling into her head. (Tr. 55-56). After a headache ends, she feels "a little off" for half an hour or so before she begins to feel clearer in her head. (Tr. 56). In addition, Ms. Guthrie testified that she is receiving treatment for anxiety and depression. (Tr. 57). She testified that when she gets stressed, her brain goes 100 miles an hour and she cannot sleep. (Tr. 43). She also testified that she is currently taking Zoloft and Wellbutrin, and is on the highest dose of Zoloft that her doctors told her they could prescribe. (Tr. 58).

Ms. Guthrie testified that she last worked in March of 2014 or 2015. (Tr. 39). Ms. Guthrie worked as a respiratory therapist for various health care providers. (Tr. 39-42). Ms. Guthrie testified that her license lapsed when she forgot to renew it due to memory issues. (Tr. 38). Ms. Guthrie testified that, as a result of her seizures, she can no longer remember how to perform skills she needs to work as a respiratory therapist. (Tr. 44).

Ms. Guthrie testified that one of her daughters is in the marching band at her school and that Ms. Guthrie attended her performances. (Tr. 36-37). She also testified that she belongs to a church and would attend on Sundays before the COVID-19 pandemic. (Tr. 51). She further testified that she sees her parents approximately every week. *Id*. Ms. Guthrie testified that she is capable of doing her own selfcare and hygiene. (Tr. 39). She also testified that she does the household chores, though she sometimes forgets recipes and sometimes puts

clothes in the wrong place. (Tr. 50). She further testified that she does some of the grocery shopping, but that she needs to make a list and that her husband comes with her because she will forget things otherwise. (Tr. 58).

### 2.  *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual of Ms. Guthrie's age, education, and vocational background who could perform work at all exertional levels but could never climb ladders, ropes, or scaffolds; never perform commercial driving; could occasionally balance, stoop, kneel, crouch, and crawl; could never work around unprotected heights or dangerous machinery; could only perform simple, routine, and repetitive tasks at a non-production rate pace; could only make simple work-related decisions; could tolerate few changes in the work setting and could only perform routine job duties that remained static and were performed in a stable, predictable work setting; and could only handle very infrequent changes that were adequately and easily explained. (Tr. 65, 68-69). The VE testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as a packager, a janitor, and a dietary aide. (Tr. 66).

The ALJ next asked the VE to consider an individual with the same restrictions but who was also limited to light work. (Tr. 66). The VE testified that the hypothetical individual could work as a price marker, a housekeeper, or a parking lot attendant. (Tr. 66-67). The ALJ also asked the VE to consider an individual with the same restrictions but who was limited to sedentary work. (Tr. 67). The VE testified that the hypothetical individual could perform work as a food and beverage clerk, a charge account clerk, and an addresser. *Id*.

The ALJ next asked the VE whether jobs existed for the hypothetical individual if the individual would be off task 25% of the time or more. (Tr. 67). The VE testified that being

off task 25% of the workday would be work preclusive. *Id*. The VE also testified that it would be work preclusive if the hypothetical individual needed to lie down during the workday outside of normal breaks. *Id*. The VE similarly testified that it would be work-preclusive if the individual missed two or more days of work per month on a regular basis. (Tr. 68). In response to a question from Ms. Guthrie's counsel, the VE further testified that it would be work-preclusive if the hypothetical individual occasionally needed to be off-task for 10-to-25-minute increments as a result of headaches or focal seizures. (Tr. 70).

### C.    Relevant Opinion Evidence

#### 1.    *Stephen Hantus, M.D.*

On June 3, 2020, Dr. Hantus completed a medical source statement for Ms. Guthrie. (Tr. 913). Dr. Hantus opined that Ms. Guthrie could stand, walk, and sit "as tolerated" because her seizures were unpredictable. (Tr. 914). Dr. Hantus further opined that Ms. Guthrie was likely to have partial or full day unscheduled absences from work occurring two or more days per month due to her focal epilepsy. (Tr. 915). The ALJ found Dr. Hantus' opinions unpersuasive because they were unsupported by the record as a whole. (Tr. 22).

#### 2.    *State Agency Medical Consultants*

Dr. Paul Tangeman, a state agency medical consultant, opined that Ms. Guthrie was not significantly limited in her ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary work routine; work in coordination with or in proximity to others; make simple work-related decisions; ask simple questions; accept instructions and respond to criticism from supervisors; get along with coworkers or peers; maintain socially appropriate behavior; be aware of hazards; travel to unfamiliar places; and set realistic goals

or make plans independently of others. (Tr. 82-83). Dr. Tangeman also opined that Ms. Guthrie was moderately limited in her ability to interact with the general public; carry out detailed instructions; maintain attention and concentration; complete a normal workday and workweek and work at a consistent pace; and respond to changes in the work setting. *Id*. Dr. Tangeman opined that Ms. Guthrie was "capable of maintaining superficial interactions with others." (Tr. 82). Dr. Ryan Mendoza concurred with Dr. Tangeman's assessment on reconsideration. (Tr. 97).

The ALJ found that the opinions of the state agency psychological consultants were "mostly persuasive" and "mostly consistent with the record as a whole." (Tr. 22). However, the ALJ rejected their opinions that Ms. Guthrie had limitations in her ability to interact with others, concluding that the record did not support that finding. *Id*.

### 3. *Garrett Guthrie*

Ms. Guthrie's husband, Garrett Guthrie, submitted a letter stating that Ms. Guthrie began having seizures in 2006 after their first child was born. (Tr. 267). Mr. Guthrie stated that, after her first seizure, she was disoriented for several days and had problems with her speech. *Id*. Mr. Guthrie also stated that Ms. Guthrie continued to have seizures and related difficulties thereafter. (Tr. 268). Mr. Guthrie stated that Ms. Guthrie's seizures decreased after her doctors changed her medication, but that she continued to have memory problems and speech issues. (Tr. 269). Mr. Guthrie testified that she had several seizures in 2018, after which she went to the Cleveland Clinic and saw improvement. (Tr. 269-70). However, Mr. Guthrie stated that Ms. Guthrie continues to experience smaller seizures three to four times a month, which result in her staring off into space, and that she also had a major seizure in 2019. (Tr. 270). Mr. Guthrie also said that Ms. Guthrie continues to have issues finishing

sentences and misplacing things. *Id*.

The ALJ found that Mr. Guthrie's statements were partially persuasive to the extent that they were consistent with the record as a whole. (Tr. 22).

### D.     Relevant Medical Evidence

On October 25, 2013, Ms. Guthrie presented to the Wexner Medical Center Department of Neurology for an evaluation of her seizures. (Tr. 274). Ms. Guthrie was diagnosed with headaches and localization-related (focal) (partial) epilepsy and epileptic syndromes with complex partial seizures, without mention of intractable epilepsy. *Id*. Ms. Guthrie reported having mild headaches that became more severe a year and a half before. (Tr. 274). Ms. Guthrie's treating physician stated that her brain MRI from April 2013 was notable for scattered sub-cortical white matter changes and a lesion in her left parietal region. (Tr. 278). The treating physician opined that the lesion may serve as a substrate for her seizures and localization-related epilepsy. *Id*. The physician recommended further work-up to determine whether Ms. Guthrie had a potential demyelinating condition such as multiple sclerosis. *Id*.

Ms. Guthrie had a follow-up visit at Wexner Medical Center on January 24, 2014 for an evaluation of multiple sclerosis. (Tr. 285). Ms. Guthrie reported that she was feeling well, denied new seizures, and was currently tolerating her medications (Trileptal and Keppra) well. *Id*. Ms. Guthrie reported that she suffered from headaches more than three times per week. *Id*. The treating physician noted that Ms. Guthrie's images were atypical for multiple sclerosis and could be seen in migraines and other autoimmune diseases. (Tr. 288).

On August 22, 2014, Ms. Guthrie had another follow-up visit at Wexner Medical Center. (Tr. 293). Ms. Guthrie reported that she was experiencing periods where she spaced

out three to four times per week, which was an increase over her prior state. *Id*. Ms. Guthrie also reported continued issues with headaches. *Id*. Ms. Guthrie did not report any recent emergency room visits or medical or neurological problems. *Id*.

On February 17, 2016, Ms. Guthrie had another follow-up visit at Wexner Medical Center. (Tr. 309). Ms. Guthrie reported that she had experienced blurry and double vision a couple weeks prior and that she was unable to respond when her husband tried to get her attention. *Id*. Ms. Guthrie also reported continuing issues with headaches. *Id*.

On May 11, 2016, Ms. Guthrie presented to Christopher J. Kalb, APRN – CNP for an initial mental health evaluation for medication management. (Tr. 508, 512). Ms. Guthrie reported periods of a slightly depressed mood. (Tr. 512). Ms. Guthrie was cooperative, and her mood was euthymic. *Id*.

Ms. Guthrie had a follow-up visit with Ms. Kalb on January 11, 2017. (Tr. 533). Ms. Guthrie reported that she had witnessed a shooting in early Summer 2016 and was suffering from anxiety. *Id*. She requested an increase in her Zoloft dosage. *Id*. On March 22, 2017, Ms. Guthrie reported that her anxiety was much improved since her Zoloft dosage had increased. (Tr. 540).

On April 13, 2017, Ms. Guthrie visited the Comprehensive Epilepsy Center at Wexner Medical Center. (Tr. 319). Ms. Guthrie reported significant depression and anxiety. *Id*. Ms. Guthrie also reported that she had very poor short- and long-term memory and was concerned about memory loss. *Id*.

Ms. Guthrie had a follow-up visit at Wexner Health Center on May 9, 2017, at which she reported experiencing short-term memory loss for the past year. (Tr. 323). Ms. Guthrie was appropriately dressed and groomed and was pleasant and cooperative. (Tr. 327). Ms.

Guthrie scored a 25/30 on the Mini Mental Status Equivalent Examination. *Id*. She was able to register three words for short term memory testing and recalled two of them after a brief delay. (Tr. 328). She made three mistakes in serial sevens, but was able to name two objects, repeat a sentence, follow three step complex commands, read and write a sentence, and copy intersecting pentagons. *Id*. On October 16, 2017, Ms. Guthrie had another follow-up visit at Wexner Health Center, where she reported spells of decreased attentiveness. (Tr. 332).

On November 23, 2018, Ms. Guthrie presented to Dr. Hantus. (Tr. 635). Dr. Hantus noted Ms. Guthrie's history of seizures and stated that she reported experiencing three different types of seizures. (Tr. 636). Ms. Guthrie also reported that she suffered from headaches characterized by an intense stabbing pain in the right frontal region. *Id*. Ms. Guthrie had a follow-up visit with Dr. Hantus on February 7, 2019. (Tr. 609). Ms.  Ms. Guthrie reported that she had not had any seizures since she began taking Vimpat and that she felt like a completely new person. *Id*.

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Guthrie last met the insured status requirements of the Act on December 31, 2019. (Tr. 15). The ALJ also determined that Ms. Guthrie did not engage in substantial gainful activity from her alleged onset date of March 1, 2015 through December 31, 2019, her date last insured. (Tr. 16).

The ALJ next determined that Ms. Guthrie had the following severe impairments: history of focal epilepsy; headaches; anxiety disorder; and depressive disorder. *Id*. The ALJ determined, however, that none of Ms. Guthrie's severe impairments, whether considered singly or in combination, met or medically equaled the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id*.

The ALJ further determined that Ms. Guthrie had the residual functional capacity ("RFC") to perform a full range of work with the following limitations:

> [N]o ladders ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can never climb ladders ropes or scaffolds. She can do no commercial driving. She can never work around unprotected heights or dangerous machinery. She is limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work. She is limited to making simple work-related decisions. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur very infrequently, and be adequately and easily explained.

(Tr. 18).

The ALJ next determined that, through her date last insured, Ms. Guthrie was unable to perform any of her past relevant work. (Tr. 23). The ALJ determined, however, that there were other jobs that existed in significant numbers in the national economy that Ms. Guthrie could perform, including work as a packager, a janitor, and a dietary aide. (Tr. 23-24). Accordingly, the ALJ determined that Ms. Guthrie was not disabled. (Tr. 24).

## V.     LAW & ANALYSIS

### A.     Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. §

405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.** **Standard for Disability**

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL

374184 at *5 (July 2, 1996).

 "A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250. The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which [the ALJ] is relying, and [the ALJ] may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See Abbott*, 905 F.2d at 923.

**C.   Analysis**

Ms. Guthrie argues that the ALJ committed reversible error in her evaluation of the state agency psychologists' opinions that Ms. Guthrie was limited to superficial interactions with others. I conclude that Ms. Guthrie's argument is well-taken.

Under the regulations applicable to Ms. Guthrie's claim, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical

sources." 20 C.F.R. § 404.1520c(a).[1] The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

Here, the ALJ found that the state agency psychologists' opinions were "mostly persuasive" (Tr. 22), but rejected their opinions that Ms. Guthrie was limited to superficial interactions with others. In reaching that conclusion, the ALJ stated that "the record does not support a finding that the claimant is limited in the amount of contact she can have with others in the workplace. It is for this reason that the undersigned has found the claimant to have a mild limitation in her ability to interact with others as discussed above." *Id*. Ms. Guthrie argues that the ALJ's analysis does not adequately discuss the supportability and consistency of the state agency psychologists' opinions, and thus does not comply with the applicable regulations. I conclude that the ALJ adequately addressed the consistency factor but failed to

---

[1] Because Ms. Guthrie filed her disability claim after March 27, 2017, the prior "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809.

adequately address the supportability factor.

    *1.*    ***Consistency***

Section 404.1520c(c)(2) defines consistency as follows:

> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(2).

Ms. Guthrie argues that the ALJ's analysis did not adequately address the consistency factor because the ALJ failed to cite specific records establishing that the state agency psychologists' opinions were inconsistent with the record as a whole. Ms. Guthrie argues that the ALJ "merely concluded that there was no support for any social functioning limitation" without pointing to what evidence supported that conclusion. (ECF No. 6, PageID # 987). But a reviewing court must read the ALJ's decision as a whole, *see Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021), and the ALJ expressly referenced her earlier discussion of Ms. Guthrie's limitations in interacting with others. There, the ALJ found that:

> In interacting with others, the claimant had a mild limitation. The claimant is treated for depression and is frequently noted to have a euthymic mood (5F). The undersigned notes that the claimant does not report difficulty interacting with others. To the contrary, she testified that she is able to attend marching band performances and run errands. However, she reported that, due to her history of seizures, she has difficulty recalling words and that her anxiety causes her to experiences racing thoughts and difficulty thinking (Hearing Testimony). In considering the claimant's testimony, the undersigned finds that the claimant has no more than a mild limitation in her ability to interact with others.

(Tr. 17).

The ALJ's analysis specifically discussed why Ms. Guthrie's medical records do not

support more than mild limitations on her ability to interact with others and the ALJ's conclusion is therefore supported by substantial evidence with respect to consistency. *See Merrell*, 2021 WL 1222667 at *7 (holding that ALJ's decision to discount weight given to opinion from treating physician was supported by substantial evidence where opinion was inconsistent with evidence in the record); *Creter v. Saul*, No. 1:20-cv-00840, 2021 WL 809323, at *11 (N.D. Ohio Mar. 3, 2021) (holding that ALJ did not err where ALJ specifically cited treatment records ALJ believed were inconsistent with treating physician's opinion and explained why).

Significantly, the ALJ's discussion of the state agency psychologists' opinions also came after the ALJ spent several pages summarizing Ms. Guthrie's medical history and treatment records. That fact similarly supports the ALJ's consistency finding. *See Merrill*, 2021 WL 1222667 at *7 (holding ALJ's statement that doctor's opinions "do not adequately reflect the claimant's functioning in [the relevant] period" was sufficient to support consistency element where ALJ also summarized other medical evidence in description of medical record); *Taylor*, 2021 WL 4477865 at *8 ("Although it would enhance the ALJ's decision to include specific record citations following such a conclusion, the Court reads the underlying decision as a whole. In this case, the ALJ's assessment of [the doctor's] opinion came after the ALJ detailed Plaintiff's medical history over three-plus single space pages.")

And while the ALJ did not use the precise term "consistency" in her analysis, that fact is irrelevant. Even where an ALJ's analysis does not "fit neatly into the 'first assess consistency and supportability, then consider other factors' framework that the post-March 27, 2017 regulation provide, the regulations do not require the ALJ to issue a perfect decision." *Merrell*, 2021 WL 1222667 at *6 (citation omitted). Accordingly, I conclude that

the ALJ properly analyzed the consistency of the state agency psychologists' opinions and
that the ALJ's analysis was supported by substantial evidence.

> 2. ***Supportability***

The ALJ's treatment of the supportability element is a different matter, as the ALJ
failed to address supportability at all in her analysis. Section 404.1520c(c)(1) defines
supportability as follows:

> The more relevant the objective medical evidence and supporting
> explanations presented by a medical source are to support his or her
> medical opinion(s) or prior administrative medical finding(s), the
> more persuasive the medical opinions or prior administrative
> medical finding(s) will be.

20 C.F.R. § 404.1520c(1). "In other words, the supportability analysis focuses on the
physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674,
2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*,
No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

Here, while the ALJ used the term "support" in her discussion of the state agency
psychologists' opinions, Ms. Guthrie is correct that the ALJ did not actually discuss whether
the explanations that the state agency psychologists provided and the evidence they relied on
supported their conclusion that she was limited to superficial interactions with others. Instead,
the ALJ said that the "the record does not support a finding that the claimant is limited in the
amount of contact she can have with others in the workplace." (Tr. 22). That sentence speaks
to whether the state agency psychologists' opinions matched the record as a whole—*i.e.*,
consistency—rather than supportability. I therefore agree with Ms. Guthrie that the ALJ failed
to analyze the supportability of the state agency psychologists' opinions and did not comply
with the governing regulations.

The Commissioner makes three arguments in response. First, the Commissioner

argues that an ALJ is not required to explain why she excluded any particular functional restriction from Ms. Guthrie's RFC. That is true. *See Pitrman v. Comm'r of Soc. Sec. Admin*., No. 1:22-CV-00711-JPC, 2023 WL 3510752, at *14 (N.D. Ohio Apr. 10, 2023), *report and recommendation adopted*, 2023 WL 3496942 ("an ALJ is not obligated to explain each limitation or restriction adopted or not adopted from a . . . physician's opinion"). However, "if a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include the medical source's limitation in his determination of the claimant's RFC." *Myers v. Comm'r of Soc. Sec.*, No. 1:18 CV 2, 2019 WL 1317788, at *9 (N.D. Ohio Mar. 22, 2019); *see also* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 ("[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted"). For the reasons discussed above, I conclude that the ALJ failed to adequately explain her omission of a superficial interaction restriction here because the ALJ did not address the supportability factor in her analysis.

Second, the Commissioner argues that the ALJ did, in fact, discuss both the consistency and the supportability prongs. The Commissioner notes that the ALJ highlighted evidence from the record, including Ms. Guthrie's own testimony, indicating that Ms. Guthrie did not have any difficult in interacting with others. As with the ALJ's own analysis, however, the Commissioner's argument addresses the consistency element, not supportability.

The Commissioner also asserts that the ALJ "evaluated . . . the evidence that was considered and discussed by Dr. Tangeman and Dr. Mendoza." (ECF No. 7, PageID # 999). However, the Commissioner does not cite to any portion of the ALJ's decision supporting that assertion. Moreover, in concluding that Ms. Guthrie had a mild limitation in interacting with others, the ALJ relied heavily on Ms. Guthrie's testimony that she attended marching

band performances and run errands. The state agency psychologists could not have considered that testimony in formulating their opinions, as the hearing before the ALJ postdated their opinions.

The Commissioner's citations to *Pifer v. Commissioner of Social Security Administration*, 1:21-CV-00314-CEH, 2022 WL 1521911 (N.D. Ohio May 13, 2022) and *Dallas v. Commissioner of Social Security*, No. 1:20-CV-1720, 2021 WL 5428827 (N.D. Ohio Oct. 26, 2021), *report and recommendation adopted*, 2021 WL 5416718, are unavailing. In *Pifer*, the court held that the ALJ adequately addressed the supportability element because the ALJ explained that the physician's opinion "was not consistent with—meaning it could not be supported by—his own treatment notes." *Id*. at *11. Similarly, in *Dallas*, the court held that the ALJ properly addressed the supportability element because the ALJ "identified discrepancies between [the physician's] opinion and (1) his own treatment notes; and (2) his own initial evaluation of Dallas's condition." *Id*. at *12. Here, by contrast, the ALJ analyzed only whether the state agency psychologists' opinions were in line with other evidence in the record, not whether the opinions were supported by the evidence the state agency psychologists themselves relied on or the explanations they provided.

Finally, the Commissioner argues that any error was harmless because the ALJ identified jobs at Step Five that Ms. Guthrie could perform that do not require more than superficial interaction with others according to the Dictionary of Occupational Titles ("DOT"). In particular, the ALJ found that a hypothetical individual with Ms. Guthrie's characteristics could perform: (1) packager (DOT code 920.587-018); (2) janitor (DOT code 381.687-018); and (3) dietary aide (DOT code 319.677-014). (Tr. 24). As the Commissioner notes, both the packager and janitor positions have a "people" code of 8, meaning the lowest

degree of interaction, while the dietary aide position has a "people" code of 7. *See Dictionary of Occupational Titles*, 920.587-018, Packager, Hand, 1991 WL 687916; 381.687-018, Cleaner, Industrial, 1991 WL 673258; 319.677-014, Food-Service Worker, Hospital, 1991 WL 672771. In addition, the janitor position has a people rating of "not significant." 1991 WL 673258. The Commissioner argues that, because the jobs identified by the VE require the lowest level of interaction, Ms. Guthrie could have performed them even if she were limited to superficial interactions with others.

There is authority supporting the proposition that a court may independently review the DOT to determine whether an ALJ's failure to include a particular restriction in an RFC constitutes harmless error. *See Sothen v. Comm'r of Soc. Sec.*, No. 1:13 CV 2426, 2014 WL 5823462, at *3-4 (N.D. Ohio Nov. 10, 2014) (holding that it was permissible for magistrate judge to consult DOT to determine whether failure to include specific limitation in RFC constituted harmless error); *Rodriguez v. Comm'r of Soc. Sec.*, No. 16-CV-11294, 2017 WL 4081848, at *1-2 (E.D. Mich. Sept. 15, 2017) (same). While it may generally be appropriate for a reviewing court to consult the DOT, however, I cannot conclude that the ALJ's error was harmless given the particular restriction at issue here.

"The Sixth Circuit Court of Appeals has not addressed whether the failure to incorporate a limitation for superficial social interaction constitutes harmless error . . . ." *Amber L. v. Comm'r of Soc. Sec.*, No. 3:21-cv-00202, 2022 WL 2948952, at *6 (S.D. Ohio July 26, 2022), *report and recommendation adopted*, 2022 WL 3226351. In *Stoodt v. Comm'r of Soc. Sec*., No. 3:20-cv-02370, 2022 WL 721455 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 WL 716105, the court noted that "the term 'superficial interaction' does not have a specific defined meaning under the DOT or [the Selected

20

Characteristics of Occupations].” *Id*. at *17 (holding that it was unclear whether ALJ's RFC was consistent with limitation to superficial contact given lack of clear vocational meaning behind term "superficial"); *see also Stephen D. v. Comm'r of Soc. Sec.*, No. 1:21-cv-00746, 2022 WL 17842940, at *5 (S.D. Ohio Dec. 22, 2022) ("No published and controlling case law, or social security regulation, or social securing ruling, defines 'superficial interactions' in vocationally precise and relevant terms.").

The *Amber L.* court similarly held that "the term 'superficial' is defined by neither the DOT nor in Social Security regulations, SSRs, or HALLEX." 2022 WL 2948952 at *6. Given the lack of clarity regarding the term "superficial," the court held that it could not "rely on the DOT's 'People' scale to conclude that the jobs cited by the ALJ at Step 5 require no more than superficial social interaction." *Id.*; *see also Wylds v. Comm'r of Soc. Sec.*, No. 3:21-CV-00365-JGC, 2022 WL 1541928, at *8-10 (N.D. Ohio Mar. 2, 2022), *report and recommendation adopted*, 2022 WL 1539266 (rejecting argument that failure to include superficial interaction limitation was harmless because jobs ALJ identified had people rating of eight); *Slone v. Comm'r of Soc. Sec.*, No. 2:20-cv-4850, 2021 WL 4901498, at *5 (S.D. Ohio Oct. 21, 2021), *report and recommendation adopted*, 2021 WL 5323115 (same).

I find the reasoning of these cases persuasive. Indeed, as the *Amber L.* court stated, "[i]t is the ALJ, not the court, who must determine what jobs can be performed by plaintiff in light of her limitations," and I decline to "perform a duty which is reserved to the ALJ." *Amber L.*, 2022 WL 2948952 at *6. Accordingly, I cannot conclude that the ALJ's failure to analyze the supportability of the state agency psychologists' opinions constituted harmless error. I therefore recommend that the Court reverse the Commisioner's decision and remand this matter for further analysis of the supportability factor with respect to the opinions of the

state agency psychologists.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the ALJ's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated: <u>June 21, 2023</u>

<u>*s/ Jennifer Dowdell Armstrong*</u>
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or

waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).